UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUZANNE CARUSO,<br><br>Claimant,<br><br>-against-<br><br>JOSEPH OCCHIOGROSSO, PATRICK WELSH, and<br>SHOP TO EARTH,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff Suzanne Caruso ("Plaintiff" or "Caruso"), by her attorneys, Bashwiner and Deer, LLC, as and for her complaint against defendants Joseph Occhiogrosso ("Occhiogrosso"), Patrick Welsh ("Welsh") and Shop to Earth ("STE"), alleges as follows:

## THE PARTIES

1.     At all times hereinafter mentioned, plaintiff Suzanne Caruso was and still is an individual residing in Fairfield, Connecticut.

2.     Upon information and belief, defendant Joseph Occhiogrosso was and still is an individual residing in Morristown, New Jersey.

3.     Upon information and belief, defendant Patrick Welsh was and still is an individual residing in Jupiter, Florida.

4.     Upon information and belief, at all times germane to the allegations in the complaint, Patrick Welsh was and still is the CEO of Shop to Earth.

5.     Upon information and belief, at all times germane to the allegations in the complaint, defendant Shop to Earth was and still is a corporation duly incorporated and existing under and by virtue of the laws of Florida, maintains an office at 8880 W. Sunset Road, 3rd Floor, Las Vegas, Nevada 89148, and has and continues to transact business in the District of New Jersey.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1332(a) and 1332(a)(1).  The value of the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs and the suit is between citizens of different states.

7.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(a) and (c), because defendants reside and/or transact business in this judicial district.

## FACTUAL BACKGROUND

### I.  Viridian And The MLM Industry – Relevant Terms And Concepts

8.      According to its website (www.viridian.com), Viridian Network, LLC and its affiliates Viridian Energy, Inc., Viridian Energy PA LLC, Viridian Energy MD LLC, Viridian Energy NJ LLC, Viridian Energy NY LLC, Viridian Energy MA LLC, and Viridian Energy CT LLC (collectively "Viridian" or the "Company") is an alternative supplier of electricity for select deregulated states and public utilities.  Viridian buys energy on the open market and sells it for a profit to both individual consumers and businesses, delivering energy "certificates" to utility companies to cover the electric load of their customer base.

9.      Public utilities charge their customers for two kinds of services on their electric bill: generation and delivery.  Generation charges are based on the amount of electricity a customer uses every month (usually measured in kilowatts) and is the fee for the actual energy being used by the customer each month.  Delivery charges are for the infrastructure costs associated with physically delivering the electricity to the consumer, including power-lines, maintenance and emergency repairs.  The deregulation of electricity in certain states nationwide allows alternative electricity suppliers – like Viridian – to compete with the public utility companies for the generation charges of consumers.

10.     The incentive for individual consumers and businesses to "switch" their electricity supplier is simple: the opportunity to save money on their monthly bill, with no added cost and no risk.  There is no fee for a customer to switch electricity suppliers; the customer gets the same single bill from their utility and the utility remains responsible for the physical infrastructure – and the attendant repairs thereto – that guarantees delivery.

11.     Viridian operates as a multi-level marketing company ("MLM").  To attract customers and have them "switch" from their current electricity supplier, Viridian relies exclusively on its multi-level marketing sales force.

12.     Viridian contracts with individual salespeople to perform the direct selling.  These individuals are referred to by the Company as "associates."

13.     The MLM business model is built around independent salespeople who enroll in the MLM by paying an enrollment fee and signing an agreement with the company, which entitles them to earn (and be paid) sales-based commissions in accordance with the terms of the MLM's compensation plan.

14.     When an individual becomes a Viridian associate, she gets a website.  The website is run by Viridian's corporate office and is the portal through which the associate will enroll more associates and bring customers directly to the Company.  The other associates and customers that the associate brings to Viridian comprise the individual associate's Viridian Business Organization (the associate's "Business").

15.     Each Viridian associate is entitled to only one website for her Business. *See* § III, ¶ 70-77, *infra*.

16.     In exchange for bringing customers to Viridian, Viridian allows its associates to earn commissions for each customer they personally switch to Viridian.  Viridian associates also earn commissions for customers that are brought in by other associates that they have recruited into their Viridian Business.  All commissions are paid according to the specific terms of Viridian's compensation plan.

17.     Viridian also claims to provide an electronic back office that is supposed to contain a set of tools to help the associate manage his or her Business.  Most importantly, the

back office is supposed to allow the associate to view her organization of associates and customers, and to track the commissions she has earned. Associates pay $14.99 per month to use their back office.

18.    An associate's Viridian Business is most easily visualized via a traditional organizational chart with the associate (in this case - Caruso) at the top. *See* Exhibit 4, attached hereto. As an associate, Caruso recruits other associates into her Business, and as those associates in turn recruit their own associates, a multi-level organization is built.

19.    From the viewpoint of the associate at the top of the Business, the associates below her – those associates that *she* has recruited into her Business – are said to be in her "down-line," while the associates above her – beginning with the person who recruited her to Viridian – are said to be in her "up-line."

20.    In the traditional MLM structure, the associate's up-line plays the role of mentor and advisor and is the starting point for resolving any issues that may arise. In the case of Viridian, § 9.2 of Viridian's Policies and Procedures specifically requires Viridian associates to bring any grievance regarding their respective Business to their up-line first. This section also directs the up-line to attempt to resolve the issue on behalf of the associate before the complaining associate approaches Viridian management with the complaint.

21.    In an MLM, the recruiting hierarchy is called a "genealogy" and an associate's compensation – calculated based upon the associate's performance in recruiting customers and other associates – is reflected in the associate's genealogy. An associate's genealogy must be a truthful, accurate and completely transparent depiction of all recruiting "sponsorships" (*i.e.*, who recruited who) because their contractual commissions are dependent upon it.

22.    Sponsorships create the multiple levels in Viridian's multi-leveled marketing plan (the genealogy) and they directly determine the commissions of an associate. The protection of an associate's true genealogy is required by any MLM to protect the efforts of its associates with whom they are contractually obligated.

23.    Consistent across MLMs and specific to Viridian, individuals are attracted to an MLM business because of two primary income concepts: (a) payment on the efforts of others, and (b) passive residual income.

Payment On The Efforts Of Others

24.    What makes the MLM business model particularly attractive to well-networked individuals, like Caruso, is the MLM concept of being paid on the efforts of the additional associates they recruit into their business. In fact, well-networked individuals are consistently the highest income earners in the MLM industry. "The concept is best described through a quote by John Paul Getty: *"I would rather have 1% of the efforts of 100 people, then 100% of my own."* MLMs in general and Viridian in particular, incentivize the recruitment of new associates. This duplication effect is how MLM companies build large sales forces, and how associates build large and lucrative businesses.

25.    Under Viridian's Compensation Plan, associates are paid for the customers they directly bring into the Company, and for the customers that their recruited associates bring into the Company. Hence the name: multi – level – marketing.

Passive Residual Income

26.    Passive residual income is the second concept critical to understanding the MLM business model. Under the terms of Viridian's Compensation Plan, the associate need only sell the product to the customer one time (the customer switches to Viridian as his new

energy supplier) and the associate continues to earn a commission on that sale for every month that the customer remains with Viridian, in perpetuity.

27.     In virtually every MLM compensation plan – and certainly in regards to Viridian's compensation plan – creating multiple levels by recruiting additional associates into one's down-line is arguably the single most important factor in determining an associate's income potential.  Being paid commissions on the efforts of a mass number of recruited associates has the power to exponentially increase the recruiting associate's income.

28.     An associate's most valuable assets are very clearly her recruits.  As set forth more fully below (*see* § II, *infra*), because the Viridian Compensation Plan pays out at multiple-levels, and because income potential for an associate is directly related to both the *number* of recruits and to the *genealogy* of "who recruited who,"  protecting the rights of associates as it pertains to the recruiting hierarchy is <u>critical</u>.  For this reason, the down-line genealogy is considered "sacred" in the MLM industry.

29.     The Direct Selling Organization ("DSA"), the gold-standard nationally for ethical behavior in regards to MLMs, mandates certain protections for the down-line genealogies of associates to ensure that the associates always remain the beneficiaries of their respective recruiting efforts.

30.     As a member, Viridian is required to adhere to the DSA's code of ethics and to protect the genealogies of its associates.  Viridian's P&P (attached hereto as Exhibit 2) is unambiguous on this point:

> <u>4.5 Change of Sponsor</u>
>
> To protect the integrity of all Marketing Organizations and safeguard the hard work of all Representatives, Viridian Network strongly prohibits changes in sponsorship.  Maintaining the

integrity of sponsorship is critical for the success of every
Representative and Marketing Organization.

31.     The crucial need for sponsorship protection becomes even more apparent

when viewed in light of the "self-perpetuating" growth inherent in any MLM organization,

including Viridian.  Once an associate successfully recruits her own down-line of associates, the

continued growth of her Business becomes, in essence, self-perpetuating, because the associate's

associates are also recruiting others for the same financial reasons.  The geometric law of

"doubling" (also known in the MLM industry as "The Power of Just 2") demonstrates that if an

associate recruits just two additional associates, and then each recruited associate in turn recruits

only two more associates per month, by the end of twelve months there would be 8170 associates

in the original associate's business and the associate could conceivably be earning a passive

residual income on all of their acquired customers.

32.     The most effective way to a launch an MLM business into self-

perpetuating status is to recruit highly networked individuals who are considered credible by their

many personal contacts.  The large contact base and existing credibility of this highly networked

individual necessarily increases the odds and speed at which an MLM business grows, and

becomes both self-generating and self-perpetuating.  MLMs are variously known in the industry

as "network marketing" or "referral marketing" for this very reason.  Highly connected

individuals are typically the industry's highest income earners and therefore most desirable

recruits.

33.     The MLM industry is also described as being "front-end loaded."  That is

to say, the time commitment required by an associate to get her MLM business into the self-

perpetuating mode is heavily weighted on the associate's initial efforts in recruiting as many

associates as quickly as possible to get the "doubling" started.  The faster the doubling can occur,

the faster an associate's income will rise.  The MLM industry describes this process as "taking the ride on the hamster wheel," visually depicting the fast and furious startup effort required to get the associate's business growing and begin the "doubling."

## II. The Viridian Compensation Plan

34.     As noted above, Caruso entered into her Agreement with Viridian in or about November 2009.  The Compensation Plan (attached hereto as Exhibit 3) is one of the three documents that make up the Agreement.

35.     The Viridian Compensation Plan is a "Rank Advancement Plan."  As an associate realizes success in selling and recruiting, she reaches certain milestones that raise her Viridian rank.  As an associate rises in rank, her payouts under the Compensation Plan increase.

36.     During the period of time that Caruso was a Viridian associate, there were eight possible ranks, the eighth and highest rank being that of "Presidential Director."

37.     At any given rank under the Compensation Plan, there were two primary types of payouts: monthly passive residual income and "overrides".

### A.  Monthly Residual Income

38.     Following enrollment, the first rank that a Viridian associate can achieve that has significant financial benefits under the Compensation Plan is that of "Marketing Professional," the fourth of eight possible ranks.  Once an associate achieves the rank of Marketing Professional, the associate is *guaranteed* a monthly passive residual income on active customers down to and including four levels of sponsorship depth in her Business.  *See* Exhibit 4, attached hereto.

39.     Viridian's Compensation Plan is a "lateral plan."  By its very structure, the Compensation Plan incentivizes associates to "build wide."  Thus, to maximize commissions

under the Compensation Plan, an associate's goal is to recruit as many other associates as she can. Every associate she personally recruits into her business is positioned at her "Level One." (The customers she personally switches also are positioned at her Level One.) The more associates she recruits, the wider her Level One will be. *See* Exhibit 4.

40.     A Viridian associate's Business can be infinitely wide. Put another way, the Compensation Plan does not limit the number of associates that can be recruited into one's Business. However, the associate's guaranteed monthly residual income is *limited to only four levels of depth* within the associate's Business, necessarily making the first four levels of an associate's Business crucial with regard to that associate's earning capacity.

41.     The Compensation Plan thus guarantees to the associate a per-customer/per-month sum of money, to an infinite width and up to four vertical levels of depth, within the associate's Business. These four levels of income constitute the associate's "Monthly Income Bonus." *See* Exhibit 3, p. 7

42.     The Monthly Income Bonus (monthly residual income) is the only guaranteed income under the Compensation Plan.

43.     All associates rely on the Compensation Plan to be applied consistently because they can only directly control the performance of the associates and customers in their Level One or frontline. In order to maximize the width (and earning potential) of an associate's Level Two, Three and Four, *all associates must be incentivized in the same manner*.

B.  Overrides

44.     The rank of Marketing Professional is the last "non-Executive" rank in Viridian's Compensation Plan. The "Executive" ranks an associate can reach are "Associate Director," "Marketing Director," "Executive Director" and "Presidential Director."

45.     The significance of the Executive ranks lies in a compensation element called an override that the associate is only entitled to receive once she enters the Executive ranks.

46.     Like the monthly residual income, an override is compensation paid on a per-customer, per-month basis. However, overrides are not limited to four levels of depth. Overrides are paid to an *infinite depth*, making them the most lucrative opportunity in the Compensation Plan.

47.     There are two kinds of overrides under Viridian's Compensation Plan. The first is a cash bonus, paying anywhere between 10 and 20 cents per customer, depending on the associate's executive rank.

48.     The second type of override is a "Generation" bonus. [1] Associates can earn up to four levels of Generation bonuses under the Compensation Plan and these Generation bonuses are directly tied to the associate's executive rank. (One Generation is earned for each of the four Executive ranks.)

49.     Unlike an associate's monthly residual income – which is guaranteed in perpetuity to the associate, so long as the customer remains with Viridian – the Generation overrides are phased in and ultimately phased out for an associate depending upon the associate's rank and the ranks of her down line. To continue to fund itself, the Compensation Plan can only pay overrides to a limited number of associates at any given time. Therefore, as lower level associates raise rank, the overrides to which the recruiting associate is entitled shift.

---

[1] A marketing professional starts to receive an override called a "group bonus" but once she achieves an Executive rank, that override is replaced by the longer lasting and far more lucrative "generation bonus."

### III. The Stacking Of Websites

50.    The "stacking" of websites provides a loophole through which an associate can exploit and effectively undermine the commission structure on which the Compensation Plan is based.

51.    When an associate is allowed to purchase multiple websites and enroll one beneath the other in their down-line, it is called a "stack." Because Viridian's compensation plan pays to four levels of depth, an associate with stacked websites effectively rigs his genealogy to allow him to be paid on the same customer sale at every website level in the stack. *See* Exhibit 5, hereto attached.)

52.    For example, if Caruso's recruit, Joe, were to stack websites and enroll three times in her down-line (three websites – "Joe 1," "Joe 2," and "Joe 3"), the genealogy would be reflected as it is in Exhibit 5. To demonstrate the impact, consider the payout of customer A. Customer A, added directly by Joe 1, falls at his Level One. Therefore, Joe would earn $2 per month residual income for that customer per the Viridian compensation plan, because Level One pays $2 per customer. But, if Joe had stacked websites, as per Exhibit 5, and enrolled a customer (Customer B) through the *lowest* website in his stack, Joe's payments would double.

53.    The stacking of websites affects the associate who engages in stacking and the associate's up-line in different ways. While it doubles the monthly customer payout for the associate who is stacking, it has a detrimental effect on the associate's up-line. The Viridian Compensation Plan pays to four levels of depth. The only way a stacker can double his money is by enrolling customers beneath his bottom-most website; this initiates payment all the way back up the stack. Because a stacking associate must necessarily concentrate his customer enrollments at the lowest website in the stack, the first two websites in his stack become essentially non-

producing. And these (now) non-producing websites represent two of the four levels available to his up-line associates to earn their commissions. The stacking associate has thereby consumed 50% of the commission opportunity for his up-line by using two of the four levels available to his up-lines for their monthly residual income payments.

54.     In short, a stacking associate compromises the Compensation Plan by enrolling multiple times and then switches customers through the lowest website to be paid up through his stack. He doubles his per customer monthly residual payment at the expense of his up-line by pushing the commissions from the stacker's recruits out of the reach of the up-line's four levels.

55.     As illustrated, not only is the act of "stacking" websites fundamentally unfair in the context of an MLM structured organization, it is inherently inconsistent with what makes an MLM organization function. Viridian associates sign up in reliance upon the fact that all other associates are operating under the same compensation plan as they are, that all other associates are "playing by the same rules." Allowing for the stacking of websites compromises the very structure on which the compensation plan is predicated.

56.     Viridian recognized this fact and expressly prohibited the ownership of multiple websites, thereby eliminating the opportunity for its associates to stack websites.

57.     Under the explicit terms of the Agreement, Viridian allowed for each of its sales associates to maintain one website and <u>only</u> one website. The P&P effective July 1, 2009, provided, in relevant part:

> 4.22 – One Viridian Network Business per Associate
>
> A representative may operate or have an ownership interest, legal or equitable, as a sole proprietorship, shareholder or member *in only one Viridian Network*

*Business.  No individual may have, operate or receive compensation from more*
*than one Viridian Network Business.*

**IV. <u>Caruso's Recognized Success At Viridian</u>**

58.     On November 23, 2009, plaintiff Suzanne Caruso enrolled in Viridian's
MLM program as an associate by paying a $199 fee and by entering into the Agreement that
entitled her to earn commissions on the customers and additional recruited associates she brought
to Viridian, in accordance with the terms of the Compensation Plan that formed a part of the
Agreement.

59.     Caruso is a former IBM marketing manager of nine years.  Subsequent to
her career at IBM, and at the time she joined Viridian, Caruso owned a retail furniture store and
had been running that business for six years.

60.     Prior to her enrollment in Viridian, Caruso had been involved in one other
MLM company called Shop to Earth ("STE"), which billed itself as a seller of environmentally
friendly or "green" products.

61.     In the course of Caruso's involvement with STE, Caruso developed a
professional relationship with the Northeast Leader of STE, Joe Occhiogrosso.

62.     Occhiogrosso is recognized in the MLM industry as both a marketing
leader and master recruiter.  At the time of Caruso's involvement with STE, Occhiogrosso had
thousands of enrolled associates in the down-line of his STE business.

63.     In or about September 2009, Caruso left STE.  At the time of Caruso's
departure, STE was experiencing a critical down-turn; leaders like Occhiogrosso were seeing
their monthly commissions reduced by as much as 80%. Believing that STE was failing, Caruso
left STE and joined Viridian to work in the industry of energy deregulation.  Recognizing the

significant financial opportunities inherent in the deregulation of the energy industry, Caruso joined Viridian, and did so with the specific intent of recruiting Occhiogrosso into this new and lucrative opportunity. Caruso expressed this intent to McFadden, as well as to Caruso's sponsor, Jim Bremm ("Bremm"), who had recruited Caruso to Viridian.

64.     Within ten days of her enrollment in Viridian, Caruso had already begun to recruit Occhiogrosso to join Viridian.

65.     By the end of December 2009 – about four weeks after her enrollment – Caruso had established a track record of success at Viridian separate and aside from her efforts to recruit Occhiogrosso. Caruso had (1) received a Top Recruiter Award from Viridian; (2) had earned a free trip to the Turks & Caicos as a recognition of her overall recruiting achievements to date; (3) had advanced four rank levels; and (4) was only one recruit away from achieving the milestone rank of marketing professional, which would provide Caruso a guaranteed monthly residual income (the maximum under the Compensation Plan) for all of the customers in her Business, to a depth of four levels.

66.     At a meeting, on or about January 6, 2010, Caruso introduced Occhiogrosso to Viridian. Present were Caruso, McFadden (Viridian's V.P. for Sales and Marketing), Occhiogrosso and five of Occhiogrosso's top recruiters. This was the first time that McFadden or anyone in Viridian management had ever met Occhiogrosso.

67.     On or about January 9, 2010, Caruso was recognized by Fallquist (Viridian's CEO) at Viridian's first Regional Meeting. Fallquist publicly recognized Caruso with a cash award and named her "Viridian's Rising Star."

68.     By mid-January 2010, less than six weeks after her enrollment in Viridian, Caruso had successfully recruited Occhiogrosso into her Viridian Business.

69.     On or about January 14, 2010, Occhiogrosso, his partner Frank Marone ("Marone"), Dan Swinarski ("Swinarski"), President of STE, and Michael Moore ("Moore"), Occhiogrosso's sponsor in STE, were all enrolled as associates in the down-line of Caruso's Viridian Business. At the time of their enrollment in Caruso's down-line, the individual websites associated with Occhiogrosso, Marone, Swinarski and Moore were all visible in Caruso's back office genealogy.

## V.  Viridian's Non-Functioning Back Office

70.     Immediately after her enrollment in Viridian in November 2009, Caruso was made aware by Viridian that the back office did not work properly system-wide and that Viridian was investing in a new software product. Thus, from the very beginning of her employment with Viridian, Caruso – and all other Viridian associates – was not able to accurately capture the customers that were enrolled in her Business (that is, she was unable to view her complete Business genealogy), nor was she able to correctly calculate her commissions. Notwithstanding the inoperative back office attached to her Business website, Viridian still charged Caruso – and all other Viridian associates – $14.99 per month for access to the broken system.

71.     In response to company wide complaints, Viridian publically announced and promised that a new back office system would be up and running by April of 2010. In fact, the new back office system did not go live until June 2010. Thus, for the first eight months of her tenure with Viridian, Caruso was not able to track the growth of her Viridian business or verify the commissions that she was entitled to under the terms of the Agreement.

## VI. <u>Viridian Attempted Partnership With STE</u>

72.    In a conference call held on or about January 11, 2010, Caruso, Fallquist, McFadden, Occhiogrosso, and Dan Swinarski ("Swinarski"), President of STE, discussed a potential partnership between Viridian and STE.  Caruso was told that a partnership between Viridian and STE would benefit both companies, based in part on Viridian's business of "green" alternative energy and STE's business of "green" products.  Caruso supported the concept of such a partnership and submitted strategies and ideas on how the two companies could benefit from one another.

73.    Upon information and belief, in subsequent meetings and conversations to which Caruso was not privy, McFadden, Fallquist, Occhiogrosso and Swinarski developed the framework for a deal between Viridian and STE.

74.    On or about January 17, 2010, Caruso was contacted by Moore who acknowledged that he and Swinarski were enrolled as associates in Caruso's down-line and that Occhiogrosso and Marone had positioned him (Moore) there as a "thank you" for having brought Occhiogrosso and Marone into STE.

75.    On or about January 20, 2010, and in response to Occhiogrosso's email request that McFadden "cut the Deal," McFadden wrote an email to Occhiogrosso setting forth the details of what he called the "STE/Viridian Deal" (the "Deal").  *Inter alia*, the Deal provided:

> *i)*      A $100 enrollment fee discount to any STE associate joining Viridian.
>
> *ii)*     A 25 cent infinite over-ride per customer, per month for Swinarski, to be paid in perpetuity.  McFadden explained in the email, in substance, that "*This over ride will be paid in perpetuity to Dan for being Dan*".

*iii)*   A Viridian website for Swinarski that would be positioned to allow Swinarski to collect commissions on all of the customers in Occhiogrosso's Viridian Business. The value of this over-ride was greater than the over-ride of a Presidential Director, the highest rank a Viridian associate could achieve.[2]

*iv)*   A Viridian website for STE CEO Pat Welsh that would also be positioned to collect commissions on all of the customers in Occhiogrosso's Viridian Business. Additionally, Welsh's website would have a permanent rank of Presidential Director grandfathered in from day one.

76.   Significantly, the Deal made no mention of any work, effort, reciprocal benefit, or partnership requirement that Swinarski, Welsh, or STE would be required to provide to Viridian in return for Viridian's generous terms.

77.   "Cross-recruiting" – soliciting MLM associates that you did not originally and personally sponsor – is a MLM industry violation. Although Occhiogrosso had thousands of associates in his STE business, he would be in violation of cross recruiting if he directly marketed to the vast majority of them.

78.   Upon information and belief, Occhiogrosso wanted to market Viridian freely to *all* of his STE associates, but he needed the approval of the STE executive team to do so. Occhiogrosso's strategy was to "buy" the support of the STE executive team.

---

[2] The magnitude of this over-ride is significant. If, for example, Occhiogrosso's Business had 100,000 customers, Swinarski's over-ride would be worth $25,000 per month (100,000 * .25), paid in perpetuity or until the customers no longer used Viridian. As of January, 2011, it is estimated that the Occhiogrosso down-line has exceeded 100,000 customers and, given the self-perpetuating nature of the MLM business model, that number can only be expected to grow.

79.    Upon information and belief, Occhiogrosso and McFadden, with the agreement of Fallquist, Swinarski and Welsh, agreed to "buy" Occhiogrosso a free hand to cross-recruit the thousands of STE associates Occhiogrosso already had in his STE business. Caruso was informed by email from Occhiogrosso that STE executives had agreed to the Deal which Caruso believed, at the time, was a legitimate business partnership.

## VII. Viridian Removes Occhiogrosso From Caruso's Down-line And Creates A Competing Compensation Plan

80.    On or about February 3, 2010, McFadden initiated a conference call with Caruso and her up-line associates, all of whom stood to benefit from Caruso's recruitment of Occhiogrosso under the terms of the Compensation Plan. On the call, McFadden stated, in substance, that:

   i)    Occhiogrosso, Swinarski, Marone and Moore would be *removed from Caruso's down line genealogy* to facilitate a "partnership" with STE;

   ii)   A new website for STE (the "Welsh" website referred to in McFadden's email to Occhiogrosso regarding the "STE/Viridian Deal") would be created with the up-line sponsor being Viridian Corporate;

   iii)  No one, including Caruso, would have access to the back office for the new STE Viridian Business (meaning that no one could see growth or customer counts);

   iv)   Caruso and her up-line associates would be paid their commissions earned *as if nothing had changed in the genealogy.*

   v)    Caruso and all of her up-line associates would be required to sign non-disclosure agreements, prohibiting them from telling anyone that they were

being paid through the STE Viridian Business, at the risk of forfeiting all income from Viridian; and

*vi)*    STE's existing down-line genealogy (order of sponsorships) would be protected, and a duplicate down-line genealogy would be inserted whole cloth into the new STE Viridian Business down-line.

81.     Upon information and belief, Occhiogrosso, McFadden, Fallquist, Welsh and Swinarski agreed that Occhiogrosso would be removed from Caruso's down-line and that STE's existing down-line genealogy would be protected by the insertion of a duplicate down-line genealogy into the new STE Viridian Business down-line.

82.     Upon information and belief, and in light of his experience as a salesperson for and involvement with MLMs in general and with Viridian and STE in particular, at the time Occhiogrosso agreed with Welsh, McFadden, Fallquist and Swinarski to remove himself from Caruso's down-line, Occhiogrosso knew the negative impact his removal would have on Caruso's commissions.

83.     Upon information and belief, and in light of his experience with MLMs as CEO for STE, at the time Welsh agreed with Occhiogrosso, McFadden, Fallquist and Swinarski to remove Occhiogrosso from Caruso's down-line, Welsh knew the negative impact Occhiogrosso's removal would have on Caruso's commissions.

84.     On or about February 5, 2010, Viridian unilaterally removed Occhiogrosso, Swinarski, Marone and Moore from Caruso's down-line.  This was a direct violation of Viridian's P&P (*see, e.g.*, § 4.5), which strictly prohibits such action, and a breach of the Agreement.

85.     On or about February 5, 2010, Viridian created a "new" down-line structure for the STE Viridian Business that was *outside* of Caruso's Viridian Business, with Viridian Corporate as the up-line sponsor. The new STE Viridian Business placed the Viridian Corporate website at the top of the down-line, followed, in descending order, by the websites of STE (under the name of Pat Welsh; henceforth "STE (Welsh)"), Moore, and Occhiogrosso. *See* Exhibit 6, attached hereto.

86.     On or about February 5, 2010, McFadden informed Caruso that Occhiogrosso would no longer be positioned at her Level One. McFadden told Caruso that the STE (Welsh) website would now be at her Level One, making Moore Caruso's Level Two and Occhiogrosso Caruso's Level Three.

87.     By this action, Viridian had effectively inserted two additional levels between Caruso and her front-line recruit Occhiogrosso. This was in direct breach of the Agreement.

88.     By inserting the STE (Welsh) and Moore Viridian Business websites between Caruso and Occhiogrosso, Viridian effectively eliminated two (out of a maximum of four) levels of commissions from Caruso's down-line, pushing the fruits of Occhiogrosso's labors (i.e., his associates and customers) out of Caruso's reach and dramatically reducing her commissions by 50%.

89.     In effect, the STE (Welsh) and Moore Viridian Business websites had usurped Caruso's rightful position in the new STE Viridian Business genealogy and they were being paid the commissions that were rightfully due Caruso under the terms of the Agreement. By inserting these two artificial levels, Caruso was in effect "footing the bill" for the STE Deal.

90.     Moreover, the insertion of STE's existing down-line directly into the Viridian Corporate Business down-line effectively undermined the entire Viridian Compensation Plan. If not for the Deal struck between Fallquist, McFadden, Occhiogrosso, Welsh and STE, STE associates would have been incentivized by Viridian's Compensation Plan and would have had to build a wide, lateral business organization to maximize their earnings. The STE Deal not only removed this incentive but required the former STE associates to recruit in a manner directly at odds with the Viridian Compensation Plan under which Caruso and all other Viridian associates were operating.

91.     The consistent application of the Viridian Compensation Plan to all associates in the Company is critical to the Agreement between Caruso and Viridian. By grafting STE's compensation plan onto Viridian's Compensation Plan, *Viridian eliminated the incentive of the associates' who were down-line from Caruso to build a wide organization.* This significantly reduced the commissions of Caruso and the associates in her up-line.

## VIII. Viridian Grants Occhiogrosso A Permanent And Infinite Override

92.     Caruso, as well as other members of her up-line, continued to voice objections to Viridian's unilateral actions; one up-line member even threatened to contact the Direct Selling Association on account of the genealogy breach and on account of a complete lack of transparency in the back office.

93.     In response, McFadden created a "Special" STE back-office. Caruso was allowed to access this "Special" back office and share the information contained therein with her up-line. As explained more fully below, *see* ¶ 178, *supra*, it was later discovered that this "Special" back office was designed to conceal the business names of the enrolled associates to enable the wrongful stacking of multiple websites.

94.     In the meantime, Caruso engaged with Occhiogrosso to launch Viridian in New Jersey and continued to build her down-line as she otherwise would have, in the hope of maintaining the good relationships she had built with McFadden and Fallquist, and in the hope that her continued negotiations with them on the issues of Occhiogrosso's removal from her down-line, the insertion of additional levels between her and Occhiogrosso, and the problematic nature of the competing STE and Viridian compensation plans, would ultimately lead to a reasonable compromise.

95.     By early February 2010, Caruso had set up the first virtual webinar facility for Viridian. She began conducting weekly recruiting webinars on behalf of Occhiogrosso and specifically for STE prospects on Monday evenings at 9:00 p.m., on her personal time. Caruso continued to conduct these webinars through June.

96.     Over 700 STE associate prospects attended Caruso's webinars and the ratio of attendance to sign-up was over 85%. Additionally, Caruso was traveling to New Jersey at Occhiogrosso's request to perform presentations, conducting private recruiting conference calls on behalf of Occhiogrosso, and acting as the 24/7 first-line support for Occhiogrosso and the hundreds of individuals he was trying to recruit, both from STE and from other sources.

97.     On or about February 15, 2010, McFadden announced the "STE Partnership" to all Viridian associates and named Caruso as the liaison between Viridian and STE.

98.     In recognition of Caruso's overall accomplishments at Viridian to date, and in particular her recruitment to Viridian of Occhiogrosso, Viridian awarded Caruso the rank of Presidential Director for a period of one year.

99.     The award of the Presidential Director ranking was confirmed in an email from McFadden to Caruso and was to have an effective date the same month that Viridian went live in New Jersey.

100.    Caruso's Presidential Director ranking provided her with additional compensation *within* the incentive structure of the existing Viridian Compensation Plan, and in no way did it negatively affect the commissions earned by any other Viridian associates, either within Caruso's own Viridian down-line or outside of it.

101.    Notwithstanding her advancement to Presidential Director ranking, Caruso continued to petition McFadden and Fallquist to reverse their decision and return Occhiogrosso to his rightful place in her Viridian Business.

102.    Upon information and belief, in or about February 2010, Viridian granted Occhiogrosso a permanent and infinite override (the "Occhiogrosso Override").[3]

103.    In contrast to the Presidential Director rank that Caruso was awarded – which had no negative impact on the commissions or compensation of any other Viridian associate – the override that McFadden and Fallquist granted to Occhiogrosso operated *outside* of Viridian's Compensation Plan; directly harmed Caruso; and constituted a breach of Caruso's Agreement with Viridian.

104.    Upon information and belief, this override was a side deal struck between Viridian and Occhiogrosso, as a complement to the Deal (*see* § VI, *supra*) between Viridian and STE.  Effectively, Viridian recognized that Occhiogrosso, a master recruiter with thousands of

---

[3] Upon information and belief, the override was valued at 25 cents per customer, per month, in perpetuity, so long as the customer remained with Viridian.  Upon information and belief, as of January 2011, the Occhiogrosso down-line contained more than 100,000 customers, making the value of the over-ride more than $25,000 a month.

pre-existing STE contacts and numerous other non-STE business contacts, would better serve

Viridian as a corporate recruiter rather than as a Level One associate in Caruso's organization.

105.    Upon information and belief, McFadden and Fallquist removed

Occhiogrosso from Caruso's down-line and paid him to become a Viridian recruiter rather than a

Caruso down-line associate. The Occhiogrosso Override incentivized Occhiogrosso to perform

in a manner that was in direct conflict with the Compensation Plan in which Caruso and all other

Viridian associates participated

106.    Precisely because of his override Occhiogrosso was no longer incentivized

to build wide lateral levels. As such, the Occhiogrosso Override effectively neutralized

Occhiogrosso's value to Caruso as her frontline, Level One recruit: henceforth, Occhiogrosso

would not be recruiting in the lateral-based manner that was contemplated by the Viridian

Compensation Plan and upon which Caruso relied to generate her contractual commissions.

107.    Much like the wholesale insertion of STE's binary compensation plan into

Viridian's (*see* ¶¶ 107-108, *supra*), the Occhiogrosso Override directly and negatively affected

Caruso's compensation by incentivizing Occhiogrosso to mass recruit STE associates and build

as big a Viridian Business as possible, with as many customers as possible, *regardless of the*

*level at which those customers entered into the down-line of his Viridian Business.*

108.    As a member of Occhiogrosso's up-line – indeed as Occhiogrosso's Level

One sponsor – Caruso was being paid commissions in accordance with Viridian's published and

agreed to Compensation Plan and she relied upon Occhiogrosso to be incentivized in the same

manner that she was. The override removed Occhiogrosso's incentive to build "wide" and it was

Caruso who was harmed the most by it.

109.   In short, Viridian "stole" Caruso's recruit and breached the Agreement with Caruso by granting her recruit, Occhiogrosso, a permanent and infinite override to mass-recruit, which incentivized him to build his Viridian Business in a manner in direct conflict with the Compensation Plan that formed a cornerstone of the Agreement between Caruso and Viridian.

## IX. Viridian Approves Occhiogrosso's "Pre-Recruiting" Efforts

110.   By in or about the second week of February 2010, Occhiogrosso was selling Viridian through marketing emails to the thousands of STE associates he had on his distribution list.  Incentivized by his override, he had also announced his first large scale hotel recruiting event at the Morristown Hilton in New Jersey.

111.   Additionally, in an email on or about February 11, 2010, Occhiogrosso announced that Viridian was further accommodating his recruiting efforts by allowing New Jersey STE associates to "pre-sign" associates to Viridian.  This meant that STE associates recruited to Viridian by Occhiogrosso could enroll in Viridian and begin to recruit more associates into their down-line business *prior* to Viridian going live in New Jersey. Essentially, STE prospects were being allowed to pre-build a down-line that would create a "snap-in" sales force ready to attract customers once Viridian went live in New Jersey.

112.   Under the Viridian Compensation Plan, rank advancement is largely based on the recruiting achievements of each individual associate.  One significant advantage of having a "pre-sign" was that associates could recruit their down-line in advance and then raise their rank almost immediately upon Viridian going live in the state.

113.   In the recruitment scenario contemplated by Viridian's Compensation Plan – where no pre-sign was allowed – it would usually take months for an associate's down-line to

train, become effective and recruit multiple levels of associates and customers into their organization in order to raise rank. This slow development allows the associate's up-line to collect override payments until the down-line associate "naturally" advances in rank. Indeed, McFadden taught Viridian associates – as did Caruso in her webinars – that Viridian's overrides are "where the money is in the plan." As the down-line begins to raise rank, the overrides diminish for the up-line.

114.    The New Jersey "pre-sign," although beneficial to Viridian and the "pre-signing" associates, had a detrimental effect on Caruso: her opportunity to earn the lucrative overrides during the course of her Viridian Businesses natural development was reduced significantly. (Occhiogrosso was unaffected because he was receiving his infinite override, regardless.)

115.    STE recruits were allowed to pre-sign associates for nearly two months prior to Viridian going live in New Jersey.

## X.   Viridian Refuses To Return Occhiogrosso To Caruso's Down-line

116.    Upon information and belief, on or about March 8, 2010, STE backed out of the Deal with Viridian. Upon information and belief, STE did not perform any marketing efforts on behalf of Viridian.

117.    In an email to Fallquist and McFadden, dated on or about March 8, 2010, Occhiogrosso wrote the following statements, in substance:

(a)    "It's irrelevant at this point if STE commits;"

(b)    "We had enough of a green light weeks ago and we ran with it;"

(c)    "We could have done it on the QT, but we got them a sweetheart deal;"

(d) "Don't commit (to STE), take back the 25 cents (the override for Swinarksi) and use it for Jersey or more trips;"

(e) "You have Frank and Joe. You don't need them".

118. In the same email, Occhiogrosso announced his intention to run two more large scale hotel recruiting efforts directed at STE associates, in a continuing effort to recruit them to Viridian.

119. In an email to STE's executive, dated March 9, 2010, Occhiogrosso writes, in substance, "You know why we're so pissed off, and we're so loyal we even cut you in on the deal."

120. Notwithstanding the fact that STE backed out of the Deal with Viridian, and notwithstanding Occhiogrosso's statements that, in any event, Viridian did not need STE's support going forward, Viridian management – specifically McFadden and Fallquist – continued to refuse to return Occhiogrosso to his rightful place in Caruso's down-line or to remove the two levels (set aside for STE (Welsh) and Moore websites) inserted between Occhiogrosso and Caruso.

## XI. Caruso Accepts A Corporate Job With Viridian

121. As early as February 2010, Viridian management – specifically McFadden and Fallquist – had been seeking Caruso's assistance on strategic matters relating to Viridian. Caruso wanted to be a part of Viridian long term and wanted a favorable resolution to the as yet unsolved compensation issues that had resulted from the tampering with her down-line. As such, Caruso responded favorably to Viridian's overtures for corporate work – in addition to continuing to build her down-line with Occhiogrosso – in the belief that doing so would further

both her career and her negotiations to undo the damage being caused by Viridian's unilateral actions vis-à-vis her down-line.

122.    On March 9, 2010, while participating in an all-day strategic planning session in Stamford, CT at the request of McFadden and Fallquist, Caruso was approached by Fallquist and offered a job to work on Viridian's corporate staff to implement strategic initiatives. Fallquist explained that Caruso's prior marketing experience with IBM was valuable to Viridian.

123.    At the time, the only management on staff at Viridian headquarters was Fallquist the CEO, and McFadden, the SVP for Sales and Marketing. Being responsible for sales, McFadden spent the vast majority of his time out of the office.

124.    Caruso recognized that the support infrastructure at Viridian was barely effective for the small Connecticut customer base that Viridian had to date and that it would in no way meet the needs of Occhiogrosso's organization of associates. New Jersey was set to go "live" in six weeks and the "pre-sign" efforts had so far exceeded expectations.

125.    Caruso understood that if the necessary field communications and attendant infrastructure was not put in place immediately to support the rapid growth expected once New Jersey went "live," Viridian would likely implode under the anticipated administrative pressure.

126.    Caruso expressed her concerns to Fallquist and further recommended that he hire a Chief Operating Officer. Fallquist conceded a need for a COO but explained that Viridian was not yet financially prepared to take on executive of that caliber.

127.    Caruso also expressed here concerns that, in order to accept a position with Viridian Corporate, she would necessarily have to close her furniture store, her only steady source of income at the time.

128.    On or about March 9, 2010, Fallquist and Caruso reached an oral agreement, later memorialized (the "Corporate Employment Agreement").  Under the terms of the Corporate Employment Agreement, Caruso would work for Viridian Corporate to implement strategic initiatives and in return Viridian would pay Caruso a steady salary (to compensate her for the closing of her store), until such time as her down-line began to pay out.  Payment under the Corporate Employment Agreement was separate from, and in addition to, any income – in the form of commissions, bonus, overrides, etc. – due Caruso under the terms of the Compensation Plan.  Caruso began performing her duties under the Corporate Employment Agreement immediately.[4]

129.    On or about March 29, 2010, Fallquist sent Caruso an email memorializing the terms of the Corporate Employment Agreement agreed to on March 9, 2010.

130.    Caruso continued to perform under the Corporate Employment Agreement until she was wrongfully terminated from her corporate position on July 8, 2010.

131.    Viridian breached the Corporate Employment Agreement with Caruso in that Caruso was never paid for her work performed pursuant to the Corporate Employment Agreement.

---

[4] The agreement was structured, in part, to assist Caruso in transitioning from her furniture business to a full-time career with Viridian. Until she accepted Viridian's offer of a corporate position, Caruso had been self-employed in a furniture business that she owned and ran for six years.  In her negotiations with Fallquist and McFadden over the terms of her Corporate Employment Agreement, one consideration was that Caruso would have to close her furniture business to devote herself to the corporate position and the compensation of $5,000 a month she was promised to receive reflected that understanding.

**XII.**     **Fallquist Admits To Manipulating Caruso's Down-line**

132.     By March of 2010, Caruso was working directly for McFadden and
Fallquist at Viridian.  Caruso was in the process of winding down her furniture business, in
reliance upon her new corporate position at Viridian and in anticipation of the large commissions
she was due to earn once Occhiogrosso was properly returned to her down-line.

133.     Caruso continued in her efforts to get McFadden to return Occhiogrosso to
her down-line.  McFadden now claimed that the STE Deal might not be dead, and that it was
Fallquist who was refusing to return Occhiogrosso to Caruso's down-line.  McFadden suggested
to Caruso that the attorney Caruso had engaged to wind down her furniture business send a letter
to Fallquist to "see if he would just sign it".

134.     On or about March 15, 2010, Caruso presented Fallquist with a letter
reiterating her decision to close her store in reliance upon the offer of a corporate position with
Viridian and asking Fallquist to memorialize their agreement that (1) Caruso would be granted
the rank of Presidential Director for a period of one year, and (2) that Caruso would be paid
commissions with Occhiogrosso at her Level One in her down-line, where he rightfully belonged
under the terms of the Agreement.

135.     On or about March 29, 2010, the same day that Fallquist memorialized the
Corporate Employment Agreement, Fallquist emailed Caruso in response to her attorney's March
15 letter.  In his email, Fallquist confirmed Viridian's commitment to grant Caruso the rank of
Presidential Director, to run for a period of one year, beginning May 1, 2010.  However, Fallquist
further stated that it was "*not his understanding*" that Occhiogrosso would be at Caruso's Level
One.

136.    Almost immediately after her receipt of the March 29 email from Fallquist, Caruso stopped receiving daily communications from Occhiogrosso who had, until that time, been sending or copying Caruso on numerous emails he sent, both Viridian related (concerning strategic and management decisions) and personal.  Henceforth, the only emails Caruso's would receive from Occhiogrosso were the mass-marketing emails he sent to the entire Viridian network.

137.    Notwithstanding this change in posture from Occhiogrosso, and Viridian management's continuing refusal to address the removal of Occhiogrosso from her down-line, Caruso continued to conduct weekly recruiting webinars for Occhiogrosso, to act as the liaison for the hundreds of Viridian New Jersey recruits, and to work as a member of Viridian's corporate management team, as per the terms of both her Agreement and her Corporate Employment Agreement.

## XIII.   Viridian Allows Occhiogrosso And STE Associates To Stack Websites

138.    On or about April 1, 2010, Caruso received a call from Jim Bremm ("Bremm"), a member of her up-line.  Bremm informed Caruso of a conference call (the "April 1 Call") that had just ended involving McFadden, Bremm and other members of Caruso's up-line.

139.    Caruso did not participate in the conference call; she was not even told by anyone at Viridian that the call was going to take place.  Upon information and belief, several members of Caruso's up-line who did participate in the call asked for Caruso to participate.  In response, McFadden told them that he, McFadden, had a separate call scheduled with Caruso on the topic.  This was patently false.

140.    Upon information and belief, during the April 1 Call, McFadden told the participating members of Caruso's up-line that Viridian's P&P had been changed as of March 1,

2010 and that *multiple website ownership was now permitted*. The ownership of multiple

websites opened the door for website stacking that was, upon information and belief, a recruiting

tool that Occhiogrosso had used at STE.

141.   Upon information and belief, and in response to the vocal protests by the

up-line members decrying this change in policy, McFadden stated in substance, that "he had told

the STE people they can have a thousand websites if they want, and that Fallquist would tell

them all (*i.e.*, the members of Caruso's up-line) to f--- off they had anything to say about it."

142.   Upon information and belief, Dave Lamson, another member of the

Caruso up-line who participated in the April 1 Call, logged into his Viridian back office during

the April 1 Call and read from the published P&P that was posted confirming that (1) the P&P

had *not* been changed; (2) the effective P&P was the July 2009 version; and (3) the stacking of

websites was still expressly forbidden.

143.   Pursuant to § 1.3 of the July 2009 P&P, Viridian is required to publish

notice of any and all changes to the Agreement.  No notice was ever given to Caruso – or, upon

information and belief, to any other Viridian associate – that the P&P had been changed to allow

for the stacking and ownership of multiple websites by a single Viridian associate.

144.   As explained above, *see* ¶¶ 70-77, *supra*, any change that would allow the

stacking of websites would be financially catastrophic to members of the stacking associate's up-

line, given the four-level deep limitation on commissions under Viridian's Compensation Plan.

**XIV.    McFadden And Fallquist Fraudulently Manipulate the P&P**

145.   Caruso understood that the stacking of multiple websites by Occhiogrosso

(or by other Viridian associates) not only cost her commission dollars, but it would also

significantly cost Viridian.  Where the stacking of multiple websites was permitted, Viridian

would be paying out more money to Occhiogrosso and others who were stacking than it should otherwise have under the terms of the Compensation Plan, because stacking websites pays double per customer.

146.    Under Viridian's Compensation plan, the stacking of three websites would return an associate $4 on every customer instead of $2, effectively doubling the commissions of the stacking Associate, and therefore doubling Viridian's costs wherever stacked websites were present.  Upon information and belief, Occhiogrosso and others could only have stacked multiple websites with the knowledge of McFadden and Fallquist and Caruso was perplexed by Viridian's decision to implement this policy.

147.    At this time it was still unclear to Caruso as to how many Viridian associates had stacked or multiple websites.

148.    On or about April 3, 2010, Caruso called Fallquist after business hours. She asked him why he would choose to permit stacking websites, increase corporate costs, and at the same time compromise the compensation plan for all Associates.  Fallquist told Caruso that he understood the issues, referred her to Policies and Procedures, and said, *"That's why you're not allowed to do it"*.  Caruso informed Fallquist of the conference call McFadden had held only days before in which McFadden had stated that he had permitted "thousands" of STE associates to stack websites.  Fallquist became notably angry and ended his call abruptly with Caruso, stating that he had to call McFadden.

149.    Within three weeks of this phone call, Fallquist announced the hiring of Bob Ulrich as Viridian's new Chief Operating Officer.   From this point forward, McFadden begins to systematically cut Caruso out of Viridian.

150.    Upon information and belief, on or about April 1, 2010, and in any event, at some point *after* the April 1 Call, McFadden, *without the notice required under Viridian's own P&P* (*see* P&P § 1.3), unilaterally and wrongfully changed the text of § 4.22 to allow for the stacking of multiple websites.

151.    To date, no notice of the change has ever been given to Caruso, and to date, upon information and belief, no notice was ever published to "*all* Representatives that the Agreement has been modified," as per the requirements of P&P § 1.3.  *See* Exhibit 2, attached hereto.

152.    The failure to give proper notice constituted a breach of the Agreement with Caruso and rendered any such changes void.

153.    Moreover, the change of the terms of the Agreement, in direct contravention of existing MLM principles to which Viridian was required to adhere and in direct opposition to the structure of Viridian's own Compensation Plan, constituted not only a breach of the Agreement, but constituted, as well, a breach of the covenant of good faith and fair dealing required under the Agreement.

## XV.  McFadden, Fallquist and Occhiogrosso Are Discovered To Own Multiple Websites And To Have Manipulated The Back Office To Cover Up The Fraud

154.    On or about April 6, 2010, Caruso emailed Fallquist and McFadden and again requested a resolution of the compensation issues involving the removal of Occhiogrosso from her down-line.  Fallquist and McFadden agreed to meet with her and a meeting was scheduled for April 14, 2010.

155.    Notwithstanding the unresolved issue of her commissions, Caruso continued to perform under the terms of her Agreement and her Corporate Employment Agreement.

156.    As of April 2010, Caruso was continuing to build her Viridian Business, conducting recruiting webinars on behalf of her down-line, fielding calls, delivering presentations, and handling field support as the corporate liaison to STE.

157.    As of April 2010, Caruso was continuing to work for Fallquist and McFadden in a staff capacity and Viridian management had come to rely on Caruso for projects crucial to Viridian's long-term growth.  For example, on or about April 7, 2010, McFadden emailed Caruso and directed her to develop the agenda for the Kickoff of the Associate Leadership Council, asking her to "spearhead" this critical effort.  On or about April 13, 2010, Fallquist directed Caruso to develop a custom banner for the Kickoff meeting and McFadden requested an agenda for the meeting no later than the following day.

158.    As of April 2010, the back office for Caruso's Business (as well as the back office for all other Viridian associates) was still not working properly.  Viridian now promised that the new back office would be up and running by May.

159.    On or about April 13, 2010, and in advance of her meeting with Fallquist and McFadden scheduled for the next day, Caruso contacted Viridian's support center and requested a corporate run report for the Occhiogrosso down-line.  (Since Occhiogrosso rightfully belonged at Caruso's Level One, the run report of his down-line would be the most accurate reflection of what Caruso's down-line should have looked like.)  Caruso and her up-line associate Jim Bremm were trying to determine how many stacked and multiple websites there might be in Caruso's down-line and the faulty back office would only generate reports down to seven levels.  At her request, a Viridian employee named Sorba sent Caruso a complete report of the Occhiogrosso down-line.  (Henceforth, the "Sorba Report.")

160.    Caruso reviewed the Sorba Report and discovered hundreds of LLC business entity websites, a website at the top of the Occhiogrosso down-line titled "SELF;" and at least four websites that had the name "Viridian" as part of the Business name.

161.    The hundreds of LLC business entity websites visible in the Sorba report were *not* visible in the "Special" back office that McFadden had created for the Caruso up-line, following the uproar over the February 3 conference call, *see* ¶ 100, *supra*, further evidencing McFadden and Fallquist's efforts to conceal the rampant website stacking and multiple website ownership that they had allowed, in direct violation of the P&P.

162.    Upon information and belief, the "Special" STE back office that McFadden had created was a mock-up designed to shield the individuals who were the true owners of the LLC-titled websites: McFadden, Fallquist and Occhiogrosso

163.    Of the 600 plus associate websites listed in the Sorba Report for the Occhiogrosso down-line, the website titled "SELF" was the only entry that had a Connecticut phone number associated with it.  And because this particular website was very high in the genealogy, it was well-positioned to collect commissions on nearly all of the associates in the down-line below it.

164.    Upon information and belief, the website titled "SELF" was McFadden's personal website and had been positioned by him to capture commissions on the STE down-line even though McFadden was doing no recruiting of his own and would not have been "recruited" into the Occhiogrosso down-line in the ordinary course of business.

165.    Upon further investigation, Caruso determined that four websites in the Occhiogrosso down-line with the name "Viridian" incorporated into their entity name, were all owned jointly by Fallquist and several principals of Centurion – Viridian's funding company – as

foreign LLC's registered in the State of Nevada. Fallquist had created one LLC website for each state that Viridian was in at the time: New Jersey, Maryland, Pennsylvania, and Connecticut, and had inserted them in Caruso's down-line, positioned to collect on the vast majority of Occhiogrosso's efforts. All four of Fallquist's websites were positioned to collect on the efforts of the Occhiogrosso down-line even though, like McFadden's SELF website, Fallquist was doing no recruiting of his own and would not have been "recruited" into the Occhiogrosso down-line in the ordinary course of business.

166.    Thus, in direct breach of Viridian's own P&P and the Agreement with Caruso, Viridian executives Fallquist and McFadden were inserting multiple, privately owned websites into Caruso's down-line, breaching the down-line genealogy for Caruso and hundreds of other up line associates, and costing Caruso valuable commissions.

167.    A review of the Sorba Report further confirmed to Caruso that – as had been alluded to during the April 1 Call – Occhiogrosso, and his partner Marone, were benefiting from at least three stacked websites in Caruso's down line, in direct violation of Viridian's P&P and in direct violation of the Agreement between Caruso and Viridian. Occhiogrosso could not have stacked multiple websites in the down-line without the knowledge of Viridian and without Viridian's authorization to do so.

168.    The Sorba Report revealed three stacked websites owned by Occhiogrosso and Marone:

| Website Name | Assoc. # | Enrollment Date |
|---|---|---|
| (1) Northeast Power LLC | 1554 | 1/14/10 |
| (2) APT Marketing Group LLC | 1744 | 3/1/10 |
| (3) E-Comm Green LLC | 1657 | 2/5/10 |

169.     Upon information and belief, and according to New Jersey Business Listings, Occhiogrosso is the registered owner of all three of the above LLCs: two owned together with Marone and one owned together with his wife.

170.     According to the State of New Jersey Public Records Business ID# 0400322065, Northeast Power LLC was formed by Occhiogrosso and Marone on December 19, 2009.  On January 14, 2010, less than one month later, the LLC was enrolled as a front-line website in Caruso's Business.

171.     Per the terms of the Agreement, and per § 4.22 of the P&P, the Northeast Power LLC was the *only* website on which Occhiogrosso and Marone were entitled to earn commissions, as the Northeast Power LLC had been organized *for the benefit of each of them.*

172.     The Sorba Report reveals that Occhiogrosso was wrongfully stacking multiple websites *long before* McFadden purportedly announced a change to the P&P on April 1, 2010 (a change that he claimed had been posted and made effective March 1, 2010) that permitted such stacking.  Moreover, upon information and belief, when the new back office finally came online in June 2010, the three stacked Occhiogrosso websites all had enrollment dates of May 17, 2010 and had very clearly been manipulated in a vain attempt to "legalize" them under the terms of the "new" (but in any event void) March 1 P&P.  Even the sequencing of the associate numbers is off (the APT Marketing Group LLC is listed as number two in the stack but has an associate number that is higher sequentially than E-Comm Green LLC – a physical impossibility), further evidencing a poorly executed cover up on the part of McFadden and Fallquist.

**XVI. The April 14 Meeting**

173.   On or about April 14, 2010, Caruso met with Fallquist and McFadden in an attempt to resolve the still outstanding issues relating to (a) the removal of Occhiogrosso from her down-line; (b) the insertion of two additional levels into Caruso's down-line (the Welsh and Moore websites, even though STE had backed out of the Deal); and (c) the stacking of Occhiogrosso websites in violation of P&P, all of which were costing Caruso commissions on thousands of associates.

174.   By the time of the April 14 meeting, Caruso was losing her entire commission base: two levels due to the artificial insertions from the STE Deal and two more levels on account of Occhiogrosso's stacking of websites.

175.   At the meeting, Caruso first confronted McFadden and Fallquist on the issue of multiple websites.

176.   McFadden stated, in substance, that there would "*probably* be only one website allowed."

177.   During the meeting, Fallquist logged into his back office and began reading aloud from the posted P&P, which had an effective date of *July 2009*, and which forbid the ownership of multiple websites by associates.

178.   Now six weeks after the "new" P&P should have gone into effect, McFadden explained that the reason the "new" P&P (presumably allowing for ownership of multiple websites) was not yet posted on the Viridian Corporate website was due to an administrative error.

179.   Caruso departed the April 14, 2010 meeting without a resolution to any of her grievances.  She was given no clarification as to Viridian's policy regarding multiple

websites and Viridian continued to refuse to reverse its decisions removing Occhiogrosso from her down-line and inserting two websites between her website and that of Occhiogrosso's, even though Welsh had backed out of the STE Deal.

180.    It became evident to Caruso that Viridian was in a quandary. If they changed Viridian's P&P (which they most clearly had not yet done) to allow for all associates to have multiple websites, Viridian would double their costs by having to pay stacking associates $4 per customer instead of $2. But Viridian very clearly could not "disallow" Occhiogrosso's multiple websites for fear of losing him and his entire STE network that stood to make Viridian – and specifically Fallquist and McFadden – millions of dollars in profits.

181.    On or about April 20, 2010, Caruso received a call from Occhiogrosso who stated in substance, "Rob (McFadden) told me you're complaining about my multiple websites – we only have three!"

182.    On or about April 21, 2010, in an email to Caruso, Occhiogrosso admitted to stacking websites for his own personal gain and acknowledged that, as a result, he was consuming three of four levels of Caruso's commissions. Occhiogrosso wrote, in substance:

      i)    With regard to his admission that he was in fact stacking multiple websites: "For such big players as we… it should not be deemed abusive or a major concern."

      *ii)*    With regard to consuming three out of four of Caruso's commission levels. He said: "*It seems we will be your first, second and a juicy third generation for you*". Occhiogrosso's reference to the "juicy" third generation is a reference to his third and lowest site. As previously discussed; the financial benefit of stacking websites requires all activity to

be added to the lowest level site. Which is why Occhiogrosso refers to it as the "Juicy" third generation.

183.    Occhiogrosso, in the same email, proposed a scenario to Caruso that would return him to his rightful place in her down line.

184.    The next day, on or about April 22, 2010, and notwithstanding months of Caruso's hitherto unsuccessful attempt to negotiate a resolution, McFadden informed Caruso that Occhiogrosso would be returned to her down-line and that this would happen *once the new back office came online*.  This never happened.

185.    As of Caruso's termination, on or about July 8, 2010, Occhiogrosso had still not been returned to Caruso's down-line.

186.    Upon information and belief, on or about July 9, 2010, Viridian returned Occhiogrosso to what had been Caruso's down-line, benefitting the Viridian associates in Caruso's up-line.

## XVII.    Viridian Pushes Caruso Out

187.    As of April 2010, Caruso was still performing under the Agreement and her Corporate Employment Agreement.  She was continuing to conduct weekly recruiting webinars, to travel to New Jersey for presentations, and to serve as the liaison for the former STE associates now working for Viridian.  Fallquist and McFadden were continuing to rely upon Caruso in a management capacity, with Fallquist even going so far as to ask that Caruso draft the outline for Viridian's first "State of Viridian" address.

188.    Yet, on or about April 27, 2010, and notwithstanding Caruso's role as liaison to the New Jersey STE associates, McFadden emailed Caruso asking her to head up the "Connecticut Re-Launch."

189.   Upon information and belief, McFadden's re-assignment of Caruso marked the beginning of a systematic strategy to cut Caruso out of Viridian's New Jersey business and limit her access to any information regarding the performance of Occhiogrosso and the associates and customers in his down-line.

190.   On or about April 30, 2010, an associate of Occhiogrosso's forwarded Caruso a week-old email from Viridian Corporate regarding a conference call that had been scheduled to discuss the New Jersey Launch and specifically the procedure for enrolling new customers in New Jersey.  The conference call was scheduled to be held that very day.  The email was sent from Viridian Corporate and was addressed to all Viridian associates who were former STE associates and who were actively recruiting in New Jersey.  Caruso, who was the up-line sponsor of New Jersey; had been intimately and directly involved in the day-to-day growth of her Viridian business; and who was appointed and performing as the liaison to STE, was not informed of the call and when she attempted to dial in through Viridian's corporate call center, no one at the switchboard would take her call or patch her in.

191.   Caruso complained to Fallquist and McFadden that not including her on the pre-launch conference call, at a minimum, deprived her of critical information that she would need for her recruitment webinars.  McFadden's one line response to her was, "Thanks for the input. You're a great asset to the team."

192.   Regardless of Caruso's role as STE Liaison, she was also still a Viridian associate and owned an All-State All-Product Viridian license. Under the terms of the Agreement she was entitled to participate in all Launch conference calls, incentive programs, and any information or program available form Viridian.  Many Viridian associates, including Caruso, had other contacts and recruiting opportunities in New Jersey, even if they were not former STE

associates, and they had purchased an "All-State All-Product" license for this very purpose. Furthermore, as Occhiogrosso was Caruso's front line recruit, she was entitled to all information relevant to her Viridian Business.

193.    Viridian stopped adding New Jersey customer enrollments to the "old" back office, thereby denying Caruso information regarding customer performance.  When Caruso inquired, she was told that even when New Jersey went live, customer enrollments would not be added to the back office; customer information would only be available when the *new back office* was implemented.  Notwithstanding this, Caruso emailed Fallquist and McFadden and again requested that they keep her informed as to customer enrollment in New Jersey, as she relied on this information to forecast her earnings.

194.    New Jersey went "live" on May 2, 2010.

195.    Without access to a working back office for her Business, Caruso could not see how many customers were signing up in New Jersey and therefore, could not forecast her future commission income.

196.    At a meeting with Fallquist on May 6, 2010, Caruso produced an analysis that showed (1) how Occhiogrosso's multiple stacked websites were costing Caruso commissions on the efforts of more than 900 associates now in the down-line (which would only continue to grow over time), and (2) how the override Viridian had given Occhiogrosso had caused him to recruit in a manner directly at odds with the structure outlined in Viridian's own Compensation Plan.

197.    Fallquist did not dispute the validity of Caruso's analysis, but he refused to make any compromises.

198.    Caruso sent a follow up email to Fallquist, documenting her analysis and requesting that he tell her precisely how many customers had enrolled in New Jersey to date, so that she could accurately forecast her income.

199.    Fallquist responded via email to Caruso and stated, in substance, "We have no information on Jersey Customers."

200.    Upon information and belief, by May 2010, the Caruso down-line had over 1,000 associates in it, which was twice the number of associates that Viridian otherwise had in the entire company.

201.    On or about May 12, 2010, Caruso was called to a meeting at Viridian's Stamford, Connecticut headquarters, as a "follow-up" to the May 6 meeting with Fallquist.  In attendance were Fallquist, McFadden, and Bob Ulrich, Viridian's new COO.

202.    McFadden gave Caruso an ultimatum.  There would be no change as to Occhiogrosso's multiple websites.  Caruso was asked to sign an agreement accepting this change. Caruso refused, stating in substance that she would not give up the commissions she was due on her down-line.

203.    McFadden responded in substance, "Then you are off the Associate Leadership Council, you're off the Connecticut Re-Launch, and you are done with all of your corporate responsibilities.  Go build your own down line."

204.    On or about May 14, 2010, two days after her meeting with McFadden, Fallquist and Ulrich and more than six months after her enrollment in Viridian, Caruso was sent her first and only commission reconciliation.  The reconciliation provided no detail and calculated her total earnings at approximately $1,200.  But the notice also stated, without any further detail, that Caruso had been *overpaid* and actually owed Viridian $95.

205.    Caruso immediately requested a detailed report from Viridian's support staff but never received a detailed response.

206.    Caruso emailed Fallquist expressing her frustration over the commission reconciliation she has just received and requested a meeting to discuss it.  Fallquist agreed to a meeting on May 17, but he canceled and postponed several times and the meeting never occurred.

207.    On or about May 26, 2010, Caruso was removed from Occhiogrosso's marketing email distribution list.

## XVIII.    The Up-Lines Confront Viridian

208.    Upon information and belief, on or about May 14, 2010 – and immediately following Caruso's meeting with McFadden, Fallquist and Ulrich where she was stripped of her corporate responsibilities, McFadden held a conference call with Caruso and the associates in Caruso's up-line in which he informed them that multiple websites were in fact permitted and that there would be no favorable financial reconciliation for them regarding the "STE" issue.

209.    On or about May 26, 2010, Viridian issued an email and registered letter to Caruso and to all of her up-line associates, informing them, in substance, that the "STE matter was concluded," that Viridian had the right to do whatever they wanted to do, and that compensation would be payable as "per the compensation plan."

210.    Upon information and belief, the associates in Caruso's up-line were incensed and at various times over the course of the next month expressed their frustration to Caruso and to McFadden and Fallquist.

211.    Dave Lamson, Patty Sinclair and Jim Bremm were some of the more vocal members of Caruso's up-line who expressed anger at how Viridian was treating them and

concern that their commissions would be greatly diminished in light of the wrongfully stacked and multiple websites.

212.    Upon information and belief, Lamson contacted Fallquist and accused both him and McFadden of breaching Viridian's Agreement with all the members of Caruso's up-line. Sinclair insisted that McFadden should be fired and she threatened to call the DSA regarding the breaches.

213.    Upon information and belief, Lamson, Bremm and Caruso sent registered letters to Viridian demanding answers to the issue of the wrongfully stacked and multiple websites and the negative impact it was having on their respective commissions.

XIX.    **Caruso Is Terminated**

214.    On or about July 8, 2010, Caruso sent three registered letters to Viridian, requesting clarification as to a) the rank of Presidential Director that she had been previously awarded; b) the current policy as to multiple websites; and c) an accurate, transparent and fully detailed commission reconciliation. Viridian never responded to any of Caruso's letters.

215.    On or about May 28, 2010, Ulrich emailed Caruso, informing her, in substance, that Viridian would honor their Presidential Director commitment to her as follows: she would be given the rank of Presidential Director for a period of one year, beginning May 1, 2010, but the rank would be on a month-to-month basis and Viridian would retain the right to change the rank at any time.

216.    Caruso responded to Ulrich that this did not represent Fallquist's commitment. Ulrich never responded.

217.    On June 6, 2010, seven months after Caruso's enrollment in Viridian, the new back office came on line. Notwithstanding McFadden's prior commitment to Caruso on or

about April 22, 2010, Caruso was able to immediately confirm that Occhiogrosso had <u>not</u>, in fact, been returned to her down-line.

218.    In an email from McFadden to Caruso, on or about June 23, 2010, and just one week prior to her termination, McFadden wrote, in substance: "you would be amazed at what a little contrition would do.  If you haven't noticed the harder you pushed and louder you got the farther out of the circle you ended up?  You had us all in the palm of your hand.  The world of Viridian was yours. We loved your drive, your ideas, your company."

219.    In an email from Occhiogrosso to Caruso on or about June 29, 2010, the first correspondence of any kind that Caruso had received from Occhiogrosso in over two months, Occhiogrosso wrote, in substance: "Thanks… yes it's crazy... over 2,500 associates. Now over 8,000 customers in a month... that's with back office glitches and launch delays... soon to be clear sailing…. You should call a truce and cash in some… whether Joe/Frank is your generation 3 or 4 making $1.00 per customer... or even just 25 cents a customer why walk away? Doesn't make sense to me."

220.    On July 8, 2010, Caruso was wrongfully terminated from her employment with Viridian.  The termination letter did not cite any reasons for her termination.

221.    Upon information and belief, on or about July 9, 2010, Occhiogrosso was returned to what had been Caruso's down-line.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
(Tortious Interference with Contract – Removal of Occhiogrosso from Caruso's Down-line)
(Defendants Occhiogrosso, Welsh and STE)

222.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

223.    At all relevant times, Caruso had a contractual relationship with Viridian.

224.    At no time were any of the defendants parties to the Agreement between Caruso and Viridian.

225.    At all relevant times, defendants were aware of the existing contractual relationship between Caruso and Viridian.

226.    By agreeing and conspiring with Viridian, Fallquist and McFadden to remove Occhiogrosso from Caruso's down-line, and with full knowledge as to the damage said act would have on Caruso, defendants intentionally interfered with the existing contractual relationship between Caruso and Viridian.

227.    The interference in the contractual relationship by the defendants was malicious in nature and wrongful, in as much as it was engineered to enrich defendants at the expense of Caruso.

228.    As a result of defendants' interference, Caruso was damaged in as much as her commissions and bonuses were drastically reduced.

229.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement, and has been damaged in an amount to be determined at trial, but in any event no less than $4,750,000.

AS AND FOR A SECOND CAUSE OF ACTION
(Tortious Interference with Contract – Insertion of 2 Additional Levels into Caruso's Down-line)
(Defendants Occhiogrosso, Welsh and STE)

230.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

231.    At all relevant times, Caruso had a contractual relationship with Viridian.

49

232.    At no time were any of the defendants parties to the Agreement between Caruso and Viridian.

233.    At all relevant times, defendants were aware of the existing contractual relationship between Caruso and Viridian.

234.    By agreeing and conspiring with Viridian, Fallquist and McFadden to insert two additional levels into Caruso's Viridian Business down-line, effectively pushing her front-line recruit, Occhiogrosso, from her Level One to her Level Three, and with full knowledge as to the damage said act would have on Caruso, defendants intentionally interfered with the existing contractual relationship between Caruso and Viridian.

235.    The interference in the contractual relationship by the defendants was malicious in nature and wrongful, in as much as it was engineered to enrich defendants at the expense of Caruso.

236.    As a result of defendants' interference, Caruso was damaged in as much as her commissions and bonuses were drastically reduced.

237.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement, and has been damaged in an amount to be determined at trial, but in any event no less than $4,750,000.

## AS AND FOR A THIRD CAUSE OF ACTION
(Tortious Interference with Contract – Insertion of STE Genealogy and Binary Comp. Plan)
(Defendants Occhiogrosso, Welsh and STE)

238.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

239.    At all relevant times, Caruso had a contractual relationship with Viridian.

240.   At no time were any of the defendants parties to the Agreement between Caruso and Viridian.

241.   At all relevant times, defendants were aware of the existing contractual relationship between Caruso and Viridian.

242.   By agreeing and conspiring with Viridian, Fallquist and McFadden to insert STE's existing down-line genealogy directly into the Viridian Corporate Business down-line – resulting in the grafting of STE's binary compensation plan onto Viridian's lateral Compensation Plan and effectively eliminated the incentive of the associates who were down-line from Caruso to build a wide organization – and with full knowledge as to the damage said act would have on Caruso, defendants intentionally interfered with the existing contractual relationship between Caruso and Viridian.

243.   The interference in the contractual relationship by the defendants was malicious in nature and wrongful, in as much as it was engineered to enrich defendants at the expense of Caruso.

244.   As a result of defendants' interference, Caruso was damaged in as much as her commissions and bonuses were drastically reduced.

245.   Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement, and has been damaged in an amount to be determined at trial, but in any event no less than $4,750,000.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
(Tortious Interference with Contract – Occhiogrosso's Override)
(Defendant Occhiogrosso)

246.   Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

247.    At all relevant times, Caruso had a contractual relationship with Viridian.

248.    At no time was defendant a party to the Agreement between Caruso and Viridian.

249.    At all relevant times, defendant was aware of the existing contractual relationship between Caruso and Viridian.

250.    By agreeing and conspiring with Viridian, Fallquist and McFadden to grant Occhiogrosso an override that operated outside of, and in direct conflict with, the Viridian Compensation Plan – an override that paid Occhiogrosso a per-customer bonus regardless of the level at which the customer entered the down-line of his Viridian Business, thereby removing any incentive Occhiogrosso had to build a wide organization – and with full knowledge as to the damage said act would have on Caruso, defendant intentionally interfered with the existing contractual relationship between Caruso and Viridian.

251.    The interference in the contractual relationship by defendant was malicious in nature and wrongful, in as much as it was engineered to enrich defendant at the expense of Caruso.

252.    As a result of defendant's interference, Caruso was damaged in as much as her commissions and bonuses were drastically reduced.

253.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement, and has been damaged in an amount to be determined at trial, but in any event no less than $4,750,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Tortious Interference with Contract – New Jersey/STE "Pre-Sign")
### (Defendant Occhiogrosso)

254.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

255.    At all relevant times, Caruso had a contractual relationship with Viridian.

256.    At no time was defendant a party to the Agreement between Caruso and Viridian.

257.    At all relevant times, defendant was aware of the existing contractual relationship between Caruso and Viridian.

258.    By agreeing and conspiring with Viridian, Fallquist and McFadden to allow Occhiogrosso's STE associates to "pre-sign" associates to their individual Viridian businesses – thereby eliminating the Generation bonuses to which Caruso was entitled – and with full knowledge as to the damage said act would have on Caruso, defendant intentionally interfered with the existing contractual relationship between Caruso and Viridian.

259.    The interference in the contractual relationship by defendant was malicious in nature and wrongful, in as much as it was engineered to enrich defendant at the expense of Caruso.

260.    As a result of defendant's interference, Caruso was damaged in as much as her commissions and bonuses were drastically reduced.

261.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement, and has been damaged in an amount to be determined at trial, but in any event no less than $4,750,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Tortious Interference with Contract – Occhiogrosso's Multiple Websites)
(Defendant Occhiogrosso)

262.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

263.    At all relevant times, Caruso had a contractual relationship with Viridian.

264.    At no time was defendant a party to the Agreement between Caruso and Viridian.

265.    At all relevant times, defendant was aware of the existing contractual relationship between Caruso and Viridian.

266.    By agreeing and conspiring with Viridian, Fallquist and McFadden to allow Occhiogrosso to maintain multiple websites within Caruso's down-line – thereby eliminating the commissions due to Caruso from several levels of her down-line – and with full knowledge as to the damage said act would have on Caruso, defendant intentionally interfered with the existing contractual relationship between Caruso and Viridian.

267.    The interference in the contractual relationship by defendant was malicious in nature and wrongful, in as much as it was engineered to enrich defendant at the expense of Caruso.

268.    As a result of defendant's interference, Caruso was damaged in as much as her commissions and bonuses were drastically reduced.

269.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement, and has been damaged in an amount to be determined at trial, but in any event no less than $4,750,000.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Tortious Interference with Contract – Viridian STE Associates' Multiple Websites)
(Defendants Occhiogrosso, Welsh and STE)

270.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

271.    At all relevant times, Caruso had a contractual relationship with Viridian.

272.    At no time were any of the defendants parties to the Agreement between Caruso and Viridian.

273.    At all relevant times, defendants were aware of the existing contractual relationship between Caruso and Viridian.

274.    By agreeing and conspiring with Viridian, Fallquist and McFadden to allow Viridian STE Associates to maintain multiple websites, and with full knowledge as to the damage said act would have on Caruso, defendants intentionally interfered with the existing contractual relationship between Caruso and Viridian.

275.    The interference in the contractual relationship by the defendants was malicious in nature and wrongful, in as much as it was engineered to enrich defendants at the expense of Caruso.

276.    As a result of defendants' interference, Caruso was damaged in as much as her commissions and bonuses were drastically reduced.

277.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement, and has been damaged in an amount to be determined at trial, but in any event no less than $4,750,000.

<u>AS AND FOR AN EIGHTH CAUSE OF ACTION</u> (in the alternative)
(Unjust Enrichment – Removal of Occhiogrosso from Caruso's Down-line)
(Defendants Occhiogrosso, Welsh and STE)

278.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

279.    Defendants agreed and conspired with Viridian, Fallquist and McFadden to remove Occhiogrosso from Caruso's down-line.

280.    Said acts taken by defendants were done intentionally and with the knowledge that doing so would enrich defendants at Caruso's expense.

281.    As a result of said acts by defendants, Caruso's commissions and bonuses were drastically reduced.

282.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement.

283.    Equity and good conscience dictate that defendants not be permitted to retain the profits rightfully due Caruso.

284.    By reason of the foregoing, defendants have been unjustly enriched at the expense of Caruso in an amount to be determined at trial, but in any event no less than $4,750,000.

<u>AS AND FOR A NINTH CAUSE OF ACTION</u> (in the alternative)
(Unjust Enrichment – Insertion of Two Additional Levels into Caruso's Down-line)
(Defendants Occhiogrosso, Welsh and STE)

285.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

286.    Defendants agreed and conspired with Viridian, Fallquist and McFadden to insert two additional levels into Caruso's Viridian Business down-line, effectively pushing her front-line recruit, Occhiogrosso, from her Level One to her Level Three.

287.    Said acts taken by defendants were done intentionally and with the knowledge that doing so would enrich defendants at Caruso's expense.

288.    As a result of said acts by defendants, Caruso's commissions and bonuses were drastically reduced.

289.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement.

290.    Equity and good conscience dictate that defendants not be permitted to retain the profits rightfully due Caruso.

291.    By reason of the foregoing, defendants have been unjustly enriched at the expense of Caruso in an amount to be determined at trial, but in any event no less than $4,750,000.

AS AND FOR A TENTH CAUSE OF ACTION (in the alternative)
(Unjust Enrichment – Insertion of STE Genealogy and Binary Compensation Plan)
(Defendants Occhiogrosso, Welsh and STE)

292.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

293.    Defendants agreed and conspired with Viridian, Fallquist and McFadden to insert STE's existing down-line genealogy directly into the Viridian Corporate Business down-line. The insertion of the existing STE down-line and the consequential grafting of STE's binary compensation plan onto Viridian's lateral Compensation Plan, effectively eliminated the incentive of the associates who were down-line from Caruso to build a wide organization.

294. Said acts taken by defendants were done intentionally and with the knowledge that doing so would enrich defendants at Caruso's expense.

295. As a result of said acts by defendants, Caruso's commissions and bonuses were drastically reduced.

296. Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement.

297. Equity and good conscience dictate that defendants not be permitted to retain the profits rightfully due Caruso.

298. By reason of the foregoing, defendants have been unjustly enriched at the expense of Caruso in an amount to be determined at trial, but in any event no less than $4,750,000.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION (in the alternative)
#### (Unjust Enrichment – Occhiogrosso's Override)
#### (Defendant Occhiogrosso)

299. Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

300. Defendant agreed and conspired with Viridian, Fallquist and McFadden to grant Occhiogrosso an override that operated outside of, and in direct conflict with, the Viridian Compensation Plan. This override paid Occhiogrosso a per-customer bonus regardless of the level at which the customer entered the down-line of his Viridian Business, thereby removing any incentive Occhiogrosso had to build a wide organization.

301. Said acts taken by defendant were done intentionally and with the knowledge that doing so would enrich defendant at Caruso's expense.

302.     As a result of said acts by defendant, Caruso's commissions and bonuses were drastically reduced.

303.     Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement.

304.     Equity and good conscience dictate that defendant not be permitted to retain the profits rightfully due Caruso.

305.     By reason of the foregoing, defendant has been unjustly enriched at the expense of Caruso in an amount to be determined at trial, but in any event no less than $4,750,000.

## AS AND FOR A TWELFTH CAUSE OF ACTION (in the alternative)
(Unjust Enrichment – New Jersey/STE "Pre-Sign")
(Defendant Occhiogrosso)

306.     Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

307.     Defendant agreed and conspired with Viridian, Fallquist and McFadden to allow Occhiogrosso's STE associates to "pre-sign" associates to their individual Viridian businesses, thereby eliminating the Generation bonuses to which Caruso was entitled.

308.     Said acts taken by defendant were done intentionally and with the knowledge that doing so would enrich defendant at Caruso's expense.

309.     As a result of said acts by defendant, Caruso's commissions and bonuses were drastically reduced.

310.     Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement.

311.   Equity and good conscience dictate that defendant not be permitted to retain the profits rightfully due Caruso.

312.   By reason of the foregoing, defendant has been unjustly enriched at the expense of Caruso in an amount to be determined at trial, but in any event no less than $4,750,000.

AS AND FOR A THIRTEENTH CAUSE OF ACTION (in the alternative)
(Unjust Enrichment – Occhiogrosso's Multiple Websites)
(Defendant Occhiogrosso)

313.   Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

314.   Defendant agreed and conspired with Viridian, Fallquist and McFadden to allow Occhiogrosso to maintain multiple websites within Caruso's down-line, thereby eliminating the commissions due to Caruso from several levels of her down-line.

315.   Said acts taken by defendant were done intentionally and with the knowledge that doing so would enrich defendant at Caruso's expense.

316.   As a result of said acts by defendant, Caruso's commissions and bonuses were drastically reduced.

317.   Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement.

318.   Equity and good conscience dictate that defendant not be permitted to retain the profits rightfully due Caruso.

319.   By reason of the foregoing, defendant has been unjustly enriched at the expense of Caruso in an amount to be determined at trial, but in any event no less than $4,750,000.

AS AND FOR A FOURTEENTH CAUSE OF ACTION (in the alternative)
(Unjust Enrichment – Viridian STE Associates' Multiple Websites)
(Defendants Occhiogrosso, Welsh and STE)

320.    Caruso repeats and realleges each and every allegation in paragraphs 1 through 221 as if fully set forth herein.

321.    Defendants agreed and conspired with Viridian, Fallquist and McFadden to allow Viridian STE Associates to maintain multiple websites.

322.    Said acts taken by defendants were done intentionally and with the knowledge that doing so would enrich them at Caruso's expense.

323.    As a result of said acts by defendants, Caruso's commissions and bonuses were drastically reduced.

324.    Caruso has lost commissions and bonuses and continues to lose commissions and bonuses rightfully earned and due under the Agreement.

325.    Equity and good conscience dictate that defendants not be permitted to retain the profits rightfully due Caruso.

326.    By reason of the foregoing, defendants have been unjustly enriched at the expense of Caruso in an amount to be determined at trial, but in any event no less than $4,750,000.

## RELIEF SOUGHT

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

(a)    that Plaintiff be awarded compensatory damages in an amount to be determined at trial;

(b)    that Plaintiff be awarded back pay and front pay in an amount to be determined at trial;

(c)     that Plaintiff be awarded attorneys' fees and costs;

(d)     that Plaintiff be awarded such other and further relief as may be just and

proper under the circumstances.

## JURY DEMAND

Pursuant to Local Rule 38(b), Plaintiff demands a trial by jury as to all issues.

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

Pursuant to Local Rule 11.2, it is hereby certified that the matter in controversy is not the

subject of any other action pending in any other court or a pending arbitration proceeding, except

for the following pending American Arbitration Association Proceeding: Suzanne Caruso v.

Viridian Network, LLC, Michael Fallquist and Robert McFadden, bearing AAA Claim No. 002-

4BV-WPT.

Dated:     April 5, 2011

BASHWINER AND DEER, LLC
Attorneys for Plaintiff

By /s/ Joseph A. Deer
   Joseph A. Deer (7291)
   Bashwiner and Deer, LLC
   6 Pompton Avenue
   Cedar Grove, New Jersey 07009
   Phone: (973) 239-4343
   Fax: (973) 239-2536
   Email: jdeer@bashdeerlaw.com